# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

STEVEN ORTIZ,

    Plaintiff,

-vs-                                                          No. CIV 00-0642 LH/WWD ACE

THE CITY OF SANTA FE,

    Defendant.

## MEMORANDUM OPINION

**THIS MATTER** comes before the Court on Defendant's Motion for Summary Judgment (Docket No. 41), filed June 22, 2001. The Court, having considered the Motion, the memoranda of the parties, the argument of counsel at the hearing on October 9, 2001, the parties' subsequently filed supplemental memoranda, and the applicable law, and otherwise being fully advised, finds that the Motion is well taken and will be **granted**.

I

Summary judgment may properly be granted if there are no genuine issues as to any material fact and the moving party is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56(c); *accord Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). Pleadings and documentary evidence must be liberally construed in favor of the nonmoving party. *Cole v. Ruidoso Mun. Schs.*, 43 F.3d 1373, 1379 (10th Cir. 1994). If the moving party satisfies its initial burden demonstrating

the absence of any genuine issue of material fact, the nonmoving party must identify sufficient evidence requiring submission of the case to a jury. *Id.*

II

From the late 1980's until October 1999, Plaintiff Steven Ortiz was employed by Defendant City of Santa Fe. The majority of his employment was at the City's swimming pools, where he worked his way up from a seasonal life guard position to classification as a full-time Recreation Supervisor in February 1998.

After experiencing hearing problems, which were diagnosed as otosclerosis, Plaintiff underwent left stapedectomy surgery on April 8, 1997. On April 28, 1997, Dr. Thomas B. Thomason, Plaintiff's surgeon, certified his return to work, with the restriction that he should be limited to non-water activity for a month. Plaintiff asserts that he made additional requests over the next year or so for work restrictions regarding getting into the pool, but was forced to change light bulbs and teach classes in the pool.

Plaintiff returned to Dr. Thomason on June 25, 1997, complaining of a sore throat, in association with increasing left ear discomfort. Dr. Thomason diagnosed follicular tonsillitis and found Plaintiff's left ear to be "unremarkable," with no evidence of middle ear effusion. On January 28, 1998, Plaintiff consulted Dr. Thomas for continued itching and pain in his ears and itching and congestion in his nose. He told the doctor that he experienced a lot more problems in his chlorinated work environment, than away from it. Dr. Thomason found that Plaintiff's hearing had stabilized and that he was a good candidate for hearing aids for his underlying sensorineural hearing loss, if the irritation in the external auditory canals could be kept under control. He also recommended custom

2

molds to keep water out of Plaintiff's ears at work. Plaintiff was fitted with ear molds and a left ear hearing aid on March 19, 1998.

On March 31, 1998, Dr. David M. Macias, a family practice and sports medicine physician, wrote on Plaintiff's behalf:

> To whom it may concern:
>
> Steve Ortiz has significant ear problems requiring surgery, custom made ear molds and hearing aids. It would be prudent to remove him from his occupational exposure to water and the chemicals used in maintaining the pools. He should in effect be reassigned to a different environment for health purposes if at all possible. Continued exposure to his present work environment will put him at significant risk for additional health problems. Thank you for your consideration.

Two days later, Plaintiff informed Peggy L. Sanchez, his supervisor, that in accordance with his doctor's orders, he was to stay out of the water. Ms. Sanchez responded by giving Plaintiff a memo asking for written confirmation by a doctor. Plaintiff claims he was required to get into the water at that time to teach a class and that, although he did not submerge his head, he was splashed by the students.

On April 3, 1998, Plaintiff gave Ms. Sanchez a copy of Dr. Macias's letter. Plaintiff followed this up on April 20th with his memo to Ms. Sanchez officially requesting accommodation for his medical problem and asking for a written response. By memo dated May 15, 1998, the City notified Plaintiff that, as a temporary accommodation, he was being transferred for the rest of the summer, with no reduction in pay, to a lifeguard position at an outdoor pool, where he would not be indoors and exposed to pool chemicals. On July 28, 1998, the City notified Plaintiff by letter that upon the closing of the outdoor pool for the season in mid-September, he would be transferred to the Parks Division as a Parks Maintenance Worker.

Plaintiff began working in the Parks Division on September 14, 1998, again with no reduction in pay. He asserts, however, that both transfers, from pool supervisor to life guard and then to maintenance worker, were not accommodation, but retaliation. He was humiliated and degraded in the maintenance position by having to pick up trash and pull weeds on his knees. He claims Parks supervisors were told he was a trouble maker and a problem employee and were asked to give him the worst jobs, work him as hard as they could, and watch him closely and report anything negative. He was subjected to derogatory comments and threats by supervisors and coworkers and was unfairly accused of performance problems and disciplined, resulting in loss of pay. Plaintiff asserts that during the Fall of 1999, he twice contacted the U.S. Equal Employment Opportunity Commission (EEOC) and discussed filing a charge of discrimination. After a physical altercation with a supervisor on September 9, 1999, Plaintiff was put on administrative leave the next day. The City terminated his employment on October 31, 1999, for insubordination and disparaging, threatening, and battering his supervisor.

On December 30, 1999, Plaintiff filed a Charge of Discrimination with the EEOC, claiming discrimination based on hearing disability. The EEOC issued a Dismissal and Notice of Rights finding for failure to establish violation of statutes on January 7, 2000. Plaintiff filed suit under the Americans with Disabilities Act of 1990 (ADA or Act), 42 U.S.C. § 12101 *et seq.*, in state district court on April 10, 2000. Defendant removed the case to federal district court on May 4, 2000. In his Amended Complaint, filed December 22, 2000, Plaintiff brings claims for discrimination based on disability and retaliation in violation of the ADA. Defendant moves for summary judgment on both claims.

III

A

Defendant first moves for summary judgment on grounds that Plaintiff cannot establish his prima facie case of discrimination because he is not disabled, if disabled, he is not qualified, and, even if disabled and qualified, he was not terminated because of his disability. As the Court agrees that the Plaintiff is not disabled for purposes of the ADA, it is unnecessary to address Defendant's other arguments.

The ADA prohibits discrimination by covered entities against qualified individuals with a disability. Specifically, it provides that no covered employer "shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Covered entities, then, including private employers, must provide "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship." *Id.* § 12112(b)(5)(A).

A "qualified individual with a disability" is identified under the Act as "an individual with a disability, who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." *Id.* § 12111(8). In turn, the term "disability" means:

> (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;
> (B) a record of such an impairment; or

5

(C) being regarded as having such an impairment.

*Id.* § 12102(2).

Subsection (A) is at issue in this case. The parties do not dispute that hearing loss is a physical impairment within the meaning of the Act. *See* C.F.R. § 1614.203(a)(2)(i) (physiological disorder or condition affecting special sense organs is physical impairment). As the Supreme Court recently has noted, however, "[m]erely having an impairment does not make one disabled for purposes of the ADA." *Toyota Motor Mfg., Ky., Inc. v. Williams*, ___ U.S. ___, ___, 122 S. Ct. 681, 690 (2002). Plaintiff also must demonstrate that his hearing loss limits a major life activity. *Id.* The Court notes that the applicable regulations for the Rehabilitation Act, promulgated by the Department of Health, Education, and Welfare, specifically list "hearing" among examples of major life activities. *See id.* (citing 45 C.F.R. § 84.3(j)(2)(ii)). Plaintiff also claims impairment of other major life activities - doing a wide variety of jobs; problems with daily activities like showering, standing, lifting, and sleeping; being allowed only to drive vans, not large trucks; and adverse effects on his ability to stand, lift, sleep, and work. As the Court finds that Plaintiff has not met his burden of showing that his hearing loss substantially limits any activity, it will not address whether each of Plaintiff's stated activities meets the strict interpretation demanded by the Act to qualify as "major," or "of central importance to daily life." *Id.* at 691.

Under the ADA regulations, "substantially limits" is defined as

    (i) Unable to perform a major life activity that the average person in the general population can perform; or
    (ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

29 C.F.R. § 1630.2(j)(1). The regulations additionally enumerate three factors that "'should be considered' when determining whether an impairment substantially limits a major life activity . . . : (i) [t]he nature and severity of the impairment; (ii) [t]he duration or expected duration of the impairment; and (iii) the permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment." *Bolton v. Scrivner, Inc.*, 36 F.3d 939, 943 (10th Cir. 1994)(quoting 29 C.F.R. § 1630.2(j)(2)).

While not an onerous burden, those claiming the Act's protection must prove their disability "by offering evidence that the extent of the limitation in terms of their own experience . . . is *substantial*." *Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 567 (1999)(emphasis added); *cf. Williams*, 122 S. Ct. at 691 ("The word 'substantial' . . . clearly precludes impairments that interfere in only a minor way with the performance of [a major life activity] from qualifying as disabilities."). Additionally, the effects of corrective measures, both positive and negative, are to be taken into account when determining whether the person is "substantially limited" in a major life activity and thus "disabled" under the Act. *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 482 (1999). The determination, then, "depends on whether the limitations an individual with an impairment *actually* faces are in fact substantially limiting." *Id.* at 488.

Plaintiff asserts in his deposition testimony that even with his hearing aid, his hearing is not the same as before his surgery and that he does not hear normally. He can hear, but it's a "different type of hearing." He has to wear his hearing aid to church, for example, and must keep his hand over his ear and really pay attention to what's being said. At church and the movies he has to sit toward the front. When his ear is infected he experiences a whistling noise and dizziness. The occasional dizziness prevents him from work framing decks and affects his abilities to stand and lift. Although

7

he is licensed to drive vans, he cannot drive big trucks. He also cannot get a job with the state police or fire department because he has a hearing aid. His doctor recommends that he not swim. He cannot take a shower with his hearing aid on.

Plaintiff admits, however, that with his hearing aid he can carry on conversations and interact with others and he describes his hearing as "reasonable." He can care for himself, sit, stand and lift, except when dizzy "every once in awhile," learn, breathe, walk, see, and perform manual tasks during the day, such as brushing his teeth, taking care of things at home, cooking, and caring for his daughter. Although Plaintiff is to some extent adversely affected by his hearing impairment, the Court cannot find on the record before it that there is any genuine issue of material fact as to whether his impairment is substantially limiting. *See Bristol v. Bd. of County Comm'rs*, 281 F.3d 1148, 1161 n.5 (10th Cir. 2002)(although question of whether "substantially limited" is factual and reserved for jury, may be decided by court upon motion for summary judgment). Thus, the Defendant's Motion for Summary Judgment on Plaintiff's ADA disability discrimination claim will be granted.

B

Defendant also moves for summary judgment on Plaintiff's retaliation claim. In its Motion, the City contends that Plaintiff cannot establish a prima facie case with regard to the alleged retaliatory acts. Additionally, at the hearing on the Motion for Summary Judgment Defendant argued new grounds, that Plaintiff's claims are barred by the statute of limitations. The Court allowed the parties to submit supplemental memoranda addressing this issue.

A plaintiff need not show that he suffers from an actual disability in order to prosecute an ADA retaliation claim; "a reasonable, good faith belief that the statute has been violated suffices." *Selenke v. Med. Imaging of Col.*, 248 F.3d 1249, 1264 (10th Cir. 2001). To establish his prima facie

8

case Plaintiff must show: 1) protected employee activity, 2) adverse employment action subsequent to or contemporaneous with the protected activity, and 3) a causal connection between the protected activity and the adverse employment action. *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1178 (10th Cir. 1999)(citing *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1324 (10th Cir. 1997)). The Tenth Circuit liberally defines the phrase "adverse employment action," taking a case-by-case approach. *Id.* With regard to conduct sufficient to rise to the level of a materially adverse employment action,

> [r]etaliatory conduct other than discharge or refusal to rehire is . . . proscribed . . . only if it alters the employee's "compensation, terms, conditions, or privileges of employment," or "adversely affect[s] his [or her] status as an employee." It follows that "not everything that makes an employee unhappy" qualifies as retaliation, for "[o]therwise, minor and even trivial employment actions that 'an irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit.'"

*Sanchez v. Denver Pub. Schs.*, 164 F.3d 527, 533 (10th Cir. 1998)(first alteration added)(quoting *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1300 (3d Cir. 1997)(quoting *Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir. 1996))).

If a plaintiff establishes his prima facie case, the burden then shifts to the employer to proffer legitimate, nondiscriminatory reasons for the adverse action. *Berry v. Stevinson Chevrolet*, 74 F.3d 980, 986 (10th Cir. 1996). If the employer sets forth legitimate nondiscriminatory reasons, the plaintiff then must establish that the defendant's reasons are merely a pretext for retaliation. *Id*. Pretext may be shown by "demonstrating 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons.'" *Anderson*, 181 F.3d at 1179

9

(quoting *Morgan*, 108 F.3d at 1323). The overall burden of persuasion remains on the plaintiff. *Sauers v. Salt Lake County*, 1 F.3d 1122, 1128 (10th Cir.1993).

As a matter of first concern, however, exhaustion of administrative remedies under the ADA is a jurisdictional prerequisite to suit in the Tenth Circuit and claims that were not part of a timely-filed EEOC charge are barred. *McBride v. Citgo Petroleum Corp.*, 281 F.3d 1099, 1104-05 (10th Cir. 2002); *Bullington v. United Air Lines, Inc.*, 186 F.3d 1301, 1310 & n.2 (10th Cir. 1999). The ADA expressly adopts the enforcement procedures governing Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, including administrative exhaustion requirements and filing procedures. *See* 42 U.S.C. § 12117(a). Pursuant to Section 2000e-5,

> A charge . . . shall be filed within one hundred and eighty days after the alleged unlawful employment practice occurred . . . , except that in a case of an unlawful employment practice with respect to which the person aggrieved has initially instituted proceedings with a State or local agency with authority to grant or seek relief from such practice . . ., such charge shall be filed by . . . the person aggrieved within three hundred days after the alleged unlawful employment practice occurred.

42 U.S.C. § 2000e-5(e)(1). The parties agree that the 300-day filing period applies in this case.

Citing 42 U.S.C. § 2000e-5(e), Plaintiff first maintains that he had 300 days from the "last act" of retaliatory or discriminatory conduct to file an EEOC charge. He then states that he has produced evidence that his termination in October 1999, along with "other acts," were in retaliation for his exercising his rights under the ADA. Plaintiff also contends that Defendant can be held liable for retaliatory or discriminatory acts that occurred outside the 300-day time limit for a continuing violation.

The statute clearly does not preserve claims of unlawful employment practices for which EEOC charges were not filed within 300 days of their occurrence, even if another alleged retaliatory

act falls within that period. The continuing violation doctrine, however, does permit "a Title VII plaintiff to challenge incidents that occurred outside the statutory time limitations of Title VII if such incidents are sufficiently related [to events occurring within the time limitations period] and thereby constitute a continuing pattern of discrimination." *Mascheroni v. Bd. of Regents of the Univ. of Cal.*, 28 F.3d 1554, 1560 (10th Cir. 1994)(alteration in original) (quoting *Hunt v. Bennett*, 17 F.3d 1263, 1266 (10th Cir. 1994)). Thus, a plaintiff suing under Title VII, or, as in this case, under the ADA, "may recover for discriminatory acts occurring prior to the statutory limitations period if at least one instance of the discriminatory practice occurs within the filing period and the earlier acts are 'part of a continuing policy or practice that includes the act or acts within the statutory period.'" *Id.* at 1561 (quoting *Martin v. Nannie and the Newborns, Inc.*, 3 F.3d 1410, 1415 (10th Cir. 1993)).

A non-exclusive, three-factor inquiry is employed to determine whether alleged incidents of discrimination constitute a continuing violation, rather than discrete, unrelated acts: "(i) subject matter--whether the violations constitute the same type of discrimination; (ii) frequency; and (iii) permanence--whether the nature of the violations should trigger an employee's awareness of the need to assert h[is] rights and whether the consequences of the act would continue even in the absence of continuing intent to discriminate." *Id.* (quoting *Martin*, 3 F.3d at 1415). While the discriminatory act occurring within the statutory period need not constitute a legally sufficient claim in itself, it must be more than merely a continuing effect of the discriminatory acts outside the period. *Id.* (citing *Martin*, 3 F.3d at 1415 & n.5). The critical question, therefore, is "not whether past practices have current consequences, but whether 'any present violation exists.'" *Id.* (parenthetical quoting *United Air Lines v. Evans*, 431 U.S. 553, 558 (1977)).

Additionally, while the continuing violation doctrine "is premised on the equitable notion that the statute of limitations should not begin to run until a reasonable person would be aware that his or her rights have been violated[, t]he permanence prong . . . limits [its] reach by restricting its operation to those situations underscored by its equitable foundation." *Martin*, 3 F.3d at 1415 n.6. Thus, "if an event . . . should have alerted a reasonable person to act to assert his or her rights at the time of the violation, the victim cannot later rely on the continuing violation doctrine to overcome the statutory requirement of filing a charge with the EEOC with respect to that event." *Id.*

Plaintiff attempts to salvage alleged retaliatory acts occurring more than 300 days before his filing with the EEOC, including being forced to work beyond his work restrictions at the swimming pool after April 1997 and his transfers, temporarily to the lifeguard position at a tot pool and then permanently to the Parks Division, under the continuing violation theory. Clearly, however, his reassignment in September 1998 from a supervisory position to maintenance worker, picking up trash and weeding on his hands and knees, a transfer that the Court finds troubling, should have put Plaintiff on notice to act to assert his rights at that time. Thus, even if Plaintiff has established a prima facie case of retaliation with regard to all of these claims, he fails to meet the third prong of the continuing violation test and they are barred by their untimeliness.

Plaintiff also claims that his termination on October 31, 1999, was in retaliation for his filing a charge with the EEOC. He did not file his EEOC charge, though, until December 30, 1999. Thus, his termination was neither subsequent to nor contemporaneous with this protected activity and he cannot establish a prima facie case on this basis. *See Anderson*, 181 F.3d at 1179 n.2.

Plaintiff further alleges, however, that he engaged in protected activity prior to his termination when he contacted the EEOC on two occasions to discuss filing a discrimination charge. Plaintiff

12

identifies these visits only as having taken place in the Fall of 1999. He also asserts that his supervisor and coworkers knew of this and that the supervisor told Plaintiff not to involve him in any charges and his coworkers called him a "rat" and "crybaby."

Plaintiff's termination, however, was the culmination of disciplinary proceedings begun on September 9, 1999, following the altercation between Plaintiff and a supervisor. By memo dated September 9, 1999, Plaintiff was notified that termination of his employment was being considered, that he was to be placed on administrative leave between September 10th and September 15th, and that a predetermination meeting would be held on the 15th. It is unclear whether Plaintiff ever returned to duty, what other procedures may have taken place, or even who made the final decision, but his employment with the City officially terminated on October 31st.

Assuming that Plaintiff has established a prima facie case of retaliation, the Court cannot find, given the sequence of events, that he has raised an inference of pretext regarding his discharge. He has offered no evidence suggesting that he was fired for reasons other than those given by Defendant, much less establishing a retaliatory motive on Defendant's part related to his Fall EEOC visits. Plaintiff's deposition version of the incident, that he merely shoved papers back at the supervisor in self defense, does not affect this conclusion. Indeed, Plaintiff did not even claim retaliation when he filed his EEOC charge in December, at which time he described the incident as a "shoving match" and admitted in his affidavit that he pushed the supervisor. Thus, Plaintiff's termination "simply completed the disciplinary process already set in motion," notwithstanding Plaintiff's visits to the EEOC before his termination. *See Morgan*, 108 F.3d at 1324-25 (finding no inference of pretext where defendant initiated disciplinary action prior to and warnings given before and after plaintiff filed charge of discrimination); *see also Pfahl v. Synthes (USA)*, No. 00-1095, 2001 WL 759927, at *3

(10th Cir. July 6, 2001); *Martinez v. Pacificorp*, No. 99-4138, 2000 WL 504857, at *3 (10th Cir. Apr. 28, 2000); *Hemsing v. Philips Semiconductors*, No. 98-2033, 1999 WL 476017, at * 4 (10th Cir. July 9, 1999); *Vigil v. Colo. Dep't of Higher Educ.*, No. 98-1174, 1999 WL 407479, at *4-5 (10th Cir. June 21, 1999); *Schmidt v. Shawnee Mission Sch. Dist.*, No. CIV. A. 98-2377-GTV, 1999 WL 1007687, at *4 (D. Kan. Oct. 27, 1999).

C

Finally, Plaintiff also complains of retaliatory harassment in the form of name calling and threats by coworkers and supervisors and unfair discipline while working for the Parks Division. These claims fail to state a prima facie case of retaliation in that they are not related to any protected employee activity on Plaintiff's part, nor do they rise to the level of a materially adverse employment action taken by Defendant.

To the extent that Plaintiff attempts to assert a cause of action for hostile work environment under the ADA, summary judgment is also appropriate. Although the Tenth Circuit has not recognized such a claim under the ADA, it has followed its sister circuits in assuming that it exists and that the elements would be similar to those required under Title VII. *Anthony v. City of Clinton*, No. 98-6188, 1999 WL 390927, at *3 (June 15, 1999)(citing *Walton v. Mental Health Ass'n*, 168 F.3d 661, 666-67 (3d Cir. 1999)(acknowledging such a claim for sake of argument); *McConathy v. Dr. Pepper/Seven Up Corp.*, 131 F.3d 558, 563 (5th Cir. 1998)(same); *Wallin v. Minn. Dep't of Corr.*, 153 F.3d 681, 687-88 (8th Cir. 1998)(same); *Keever v. City of Middletown*, 145 F.3d 809, 813 (6th Cir. 1998)(implicitly recognizing ADA hostile work environment claim)); *see also Fox v. Gen. Motors Corp.*, 247 F.3d 169, 175-76 (4th Cir. 2001)(concluding ADA, like Title VII, creates cause of action for hostile work environment harassment)). To establish a hostile work environment claim,

an ADA plaintiff must prove: "(1) he is a qualified individual with a disability; (2) he was subjected to unwelcome harassment; (3) the harassment was based on his disability; (4) the harassment was sufficiently severe or pervasive to alter a term, condition, or privilege of employment; and (5) some factual basis exists to impute liability for the harassment to the employer." *Fox*, 247 F.3d at 176.

Because Plaintiff has not shown that his impairment is substantially limiting, he is not a qualified individual with a disability under the ADA. Additionally, much of the harassment of which he complains at the Parks Division was not based on any disability. Specifically, Plaintiff claims that his supervisor was told in September and October 1998 that he was a troublemaker and to report any negative information about him; in November 1998 he was called a "rat" by coworkers and they stated they were going to shoot him; in June and July of 1999 he was not allowed to take off work for doctor appointments or was written up for taking time off to go to the doctor; in April, May, and June of 1999 his supervisor changed the starting times for work without informing Plaintiff and then verbally reprimanded him for being late; from April to October 1999 coworkers called him derogatory names because they had been informed that he had transferred to the Parks Division at a higher rate of pay than the rest of the maintenance workers; during the summer of 1999 he was forced to use a weed eater that was very loud and hurt his ears; and in the Fall of 1999 his supervisor told Plaintiff not to involve him in his EEOC charge and his coworkers called him a "rat" and "crybaby" because he contacted the EEOC. Furthermore, to the extent any of these incidents are related to his hearing impairment, they are not sufficiently severe or pervasive to alter the conditions of his employment.

An Order in conformance with this Memorandum Opinion shall be entered contemporaneously.

_____
**UNITED STATES DISTRICT JUDGE**